**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **VERMONT MUTUAL INSURANCE COMPANY**<br>a/s/o Paul and Amey Larrat<br>Plaintiff<br><br>v.<br><br>**P & J ALARM COMPANY**<br>Defendant | : | C. A. No.: 04-315T |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Vermont Mutual Insurance Company, as subrogee of Paul and Amey Larrat, through their undersigned counsel, hereby answers and opposes defendant P&J Alarm Company's Motion for Summary Judgment, and, on the basis of the facts and authorities set forth in the accompanying Memorandum of Law, plaintiff respectfully requests this Honorable Court to deny defendant's Motion.

Respectfully submitted,

ROBERTS, CARROLL, FELDSTEIN & PEIRCE

BY: ______________________

Marco U[illegible]ti, Esquire
Ten Weybosset Street – 8th Floor
Providence, RI 02903
Tel.: 401-521-7000
Fax: 401-521-1328

COZEN O'CONNOR

BY: ______________________

Robert M. Caplan, Esquire
1900 Market Street
Philadelphia, PA 19103
Tel: 215-665-4191
Fax: 215-701-2491

Dated: June 3, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **VERMONT MUTUAL INSURANCE COMPANY**<br>a/s/o Paul and Amey Larrat<br>Plaintiff<br><br>v.<br><br>**P & J ALARM COMPANY**<br>Defendant | : | C. A. No.: 04-315T |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This action arises out of a fire which occurred on August 13, 2003 at the residence of Paul and Amey Larrat located at 167 Tillinghast Road, East Greenwich, Rhode Island (hereinafter "the Property"). The fire is believed to have been caused by a lightning strike to the house. The fire caused more than $418,000 in real and personal property damage to the residence. The Larrats were reimbursed for their losses by plaintiff, Vermont Mutual Insurance Company (hereinafter "Vermont Mutual"), which became subrogated to the Larrats' rights to pursue claims against any culpable third parties for the damage.

Unfortunately, what should have been a rather minor fire became a major conflagration destroying a significant portion of the Property. The fire alarm system installed by defendant P&J Alarm Company (hereinafter "P&J") failed to operate properly by not sending any signal to the central monitoring facility. This failure of the system allowed the fire to burn out of control for an extended period of time until it was reported by a passerby to the authorities. Once reported, the fire department began extinguishment activities approximately two minutes after receiving the call. However, as a result of the late notice, the fire was permitted to spread

throughout the second floor of the house and ultimately damaged more than ninety percent (90%) of the structure.

In June of 1994, defendant P&J updated the alarm system at the Property, including the installation of a new panel control box, wiring and the initiation of central station monitoring. At that time, the Larrats signed a purchase order and entered into an Alarm Service Monitoring Agreement. In March of 1998, the Larrats entered into another agreement with defendant P&J for the some additions to the existing alarm system. The agreements contain a limitation of liability provision. Defendant now seeks summary judgment exclusively on the basis of the limitation of liability provision. Defendant does not contest that the system failed to operate and that the failure resulted in the spread of fire. Rather, defendant argues that its liability is limited to one half of the annual service charge ($96) and, therefore, the damages are below this Court's jurisdictional threshold and the case should be dismissed.

At the time P&J entered into these agreements, it did not have a state mandated license for fire alarm installation and monitoring. In addition, the agreements did not contain the alarm contractor's license number as is required by statute. Accordingly, P&J did not have the capacity to enter into any of the agreements and they are all, therefore, rendered void.

The contracts were also based on material misrepresentations by P&J regarding its corporate licensure and certification and the licensure of its installers. In soliciting and engaging fire alarm system installation and monitoring, P&J inherently represented that it was a properly licensed fire alarm contractor and that it installers were properly trained and licensed. However, neither P&J nor its installers had the statutorily required licenses to do fire alarm installations. Paul Larrat stated under oath that he relied on this misrepresentation and would not have entered into the agreement if he was aware that they were not certified or licensed. Because the contract is based on material misrepresentations by P&J, it is void.

Even if the contracts are deemed valid, P&J cannot contractually limit its liability or exculpate itself for grossly negligent conduct. P&J correctly points out that the Rhode Island courts have held that this type of limitation of liability provision in an alarm contract is enforceable for claims involving an alarm company's negligence. However, plaintiff has alleged that defendant P&J's conduct went beyond mere negligence and rose to the level of gross negligence or recklessness. Plaintiff asserts that the limitation of liability provision is not applicable to claims involving this level of egregious conduct. While Rhode Island has yet to address this issue, a number of surrounding jurisdictions have held that this exact same limitation of liability language is not applicable where an alarm company's conduct is grossly negligent.

Plaintiff's alarm expert, Robert Schifiliti, examined the alarm system at the Laratt's residence and found that the installation was replete with code violations. For example, within the various alarm system components he found a cigarette, window foil and an improperly sized fuse. He found the installation to be "amongst the worst and most incomplete" that he ever experienced. Based on the problems found within system and the fact that P&J was knowingly operating without a statutorily required fire alarm license and allowing inexperienced and unlicensed installers to do the work, there is a genuine issue of material fact as to whether P&J's conduct was grossly negligent, which makes summary judgment inappropriate.

## II. STATEMENT OF FACTS

The Larrats purchased the Property in November 1992. At the time they purchased it, the Property had a local alarm system but no monitoring system. In 1993, there was a small fire at the Property. Following the fire, the Larrats contacted P&J about setting up a monitoring system and installing some upgrades on the existing fire alarm system. On July 5, 1994, Paul Larrat signed an agreement with P&J to update the existing alarm system and to install additional components on the system. On that same date he also entered into an Alarm Monitoring Service

Agreement with P&J. The upgraded system was installed by Tom Somers of P&J. After the system was installed, P&J came out several times to test some of the contacts in the system and to clean the smoke detectors. No one other than P&J ever worked on the alarm system after it was installed in 1994.

In 1998, the Larrats added an addition on their home and contracted with P&J to install additional detectors and do some wiring so that the alarm system covered the addition. On March 23, 1998, the Larrats signed another agreement with P&J for the installation of this additional alarm equipment. Tom Somers did the upgrade in 1998 along with one other person from P&J, likely David Russo.

On August 13, 2003, a fire erupted at the Property. At the time of the fire, the Larrats were vacationing in the Adirondacks. Susan Hawksley, the local Fire Marshal, determined that the fire occurred as a result of a lightning strike on the roof of the house in front of the chimney. Mr. MacPhearson, the Larrats' neighbor, called the Fire Department at approximately 9:27 p.m. The Fire Department arrived at the Property within two minutes. Several other neighbors reported hearing a lightning strike around 8:30 p.m. When the Fire Department arrived, they broke in through the glass doors and the burglar alarm went off.

Robert F. Schifiliti, P.E., examined the alarm system following the fire on behalf of the plaintiff. (See Exhibit A, Schifiliti Report). In the control panel of the alarm system, he found "a nest of cross connected wires." (Id. at p. 3). Amongst the most glaring problems he observed with the system were: a **Merit cigarette** inside the back of the first floor smoke detector; an improper ground circuit in the main circuit board; and a fuse too small for the system wrapped in **tin foil**. (Id. at p. 4-5).[1] Based on his review of the testimony of P&J employees, he found that

[1] Because defendant has not produced most of the documentation requested by plaintiff in discovery, Schifiliti has not yet been able to determine the exact failure mode in the alarm

P&J permitted inexperienced persons to plan and install systems without the supervision required by the State of Rhode Island licensing laws. (Id. at p. 11). Schifiliti characterized the installation done by P&J as "amongst the worst and most incomplete that I have experienced." (Id.) He found that the practices of the company were "lackadaisical and not aimed at quality, safety or even minimum industry standards" and that P&J's pattern of business suggests "a level of gross negligence on the party of P&J, indicating their desire to collect fees without the burden of ensuring proper system operation." (Id.)

Thomas Somers was the person at P&J responsible for both installations at the Property. In 2001, he obtained the corporate license for P&J to do work. (See Exhibit B, Excerpts of Deposition of Thomas Somers, at p. 13:4-17). In 1992, Paul Santa, the principal of P&J and the holder of the AF license, died. (Id. at p. 14:15-25). After that time, P&J did not have an AF license, rather P&J was using the license of another electrician, Jim Governor of JED Electric, to pull permits. (Id. at p. 15:22 – 16:18). Rhode Island does not permit one person to hold an alarm license for two separate companies. (Id. at p. 19:24 – 20:2).[2] In 2001, P&J was caught by the electrical inspector and told that it did not have a valid alarm license and had 30 days to get one. (Id. at p.18:13 – 19:8). At that time, P&J requested the Somers get the AF license for the company. (Id.) Somers conceded that between the time Paul Santa died in 1992 and the time he obtained the AF license for the company in 2001 that P&J was operating improperly and without an alarm contractor's license. (Id. at p. 24:11 – 25:6). Somers left the company in December

---

system that prevented a fire alarm signal from being sent. Plaintiff plans to file a motion to compel production of these materials.

[2] The State of Rhode Island Department of Business Regulation, Division of Commercial Licensing has promulgated a set of rules for licensing of alarm companies. Section 10 states that "no alarm agent shall be licensed to more than one alarm business at one time unless the second or subsequent alarm business employing the agent is owned and operated by the same individual, firm, partnership or corporation who owns and operates the agent's primary employing alarm business."

2001 and took his AF license with him, yet P&J continued to do fire alarm work. (Id. at p. 40:2–24).

Judy Santa, the principal of P&J, confirmed during her deposition that Jim Governor was holding the license for P&J from the period when her husband died until Somers obtained his Master's license. She admitted that Governor did not work for her and was not paid by the company.

In addition to the licensing requirement for the alarm contractor, the installer, himself, must also have a Master's license to do an installation. (Id. at p. 44:4-13). Somers admitted that he did a number of installations by himself before obtaining his Master's license. (Id. at p. 44:14 – 45:18). He did not obtain his Master's license until 1997 or 1998. (Id. at p.46:8-25). At the time of the first installation at the Property in 1994, Somers was still an apprentice and did not hold a Master's or a Journeyman's installation license. (Id. at p. 66:21 – 67:10; 86:1-3). Jim Governor did not have any role in the installation and did not inspect the installation when completed. (Id. at p. 88:2-7). He does not think that a permit was ever pulled for installation at the Property and he considered it a substandard system. (Id. at p. 51:16-52:6).

From the period of 1992 until 2001, Somers described himself as "the man" at P&J. (Id. at p. 55:7-9). There were some other installers during that time period, including David Russo. (Id. at p. 55:10-14). Russo did not have any alarm licenses. (Id. at p. 57:4-15). There were also some other installers who were paid under the table. (Id. at p. 56:7-10; 57:23 – 59:7). Somers did not believe that most of these people were qualified to install fire alarm systems. (Id. at p. 59:9-12).

In reviewing photos of the alarm panel installed by P&J, Somers admitted that he used window foil to make a fuse fit and that this was not an acceptable practice. (Id. at p. 112:19-113:5; 114:1-5). He admitted that the grounding wire was "very poorly terminated" and that this

particular installation was "extremely sloppy" because he was only an apprentice at the time. (Id. at p. 135:7; 136:11-14). He also admitted that there was a cigarette in the back of one of the smoke detectors. (Id. at p.133:1-3).

Paul Larrat stated under oath that at the time he entered into each one of the agreements with P&J, he believed that P&J was certified and properly licensed to perform fire alarm installation and monitoring work. (See Exhibit C, Paul Larrat Affidavit). He was never told by P&J that they were not properly licensed or certified and did not find this out until he was notified during this litigation. (Id.) If he had known that P&J was not certified or properly licensed, he would not have entered into any agreements with P&J and he would have found another contractor to do the work at his house. (Id.)

## III. LEGAL ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 authorizes the grant of summary judgment only when the moving party demonstrates that, based on the pleadings, depositions, answers to interrogatories and affidavits, no genuine dispute as to any material fact exists, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In determining whether summary judgment is appropriate, the court must view the entire record in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). Summary judgment is permitted only in the clearest of cases. Id. When determining whether disputed facts are genuine, the court must review the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Fleet Nat. Bank v. Liuzzo, 766 F.Supp. 61 (D.R.I. 1995).

## B. DEFENDANT P&J DID NOT HAVE THE CAPACITY TO ENTER INTO THE ALARM INSTALLATION OR MONITORING CONTRACTS BECAUSE IT LACKED THE STATE MANDATED ALARM CONTRACTOR'S LICENSE, THEREFORE ALL FO THE CONTRACTS ARE VOID

The State of Rhode Island has adopted very specific licensing requirements for companies engaging in fire alarm installations. R.I. Gen. Laws § 5-6. Rhode Island General Law § 5-6-2 provides as follows:

> No person, firm or corporation shall **enter into, engage in, solicit, advertise, bid for, or work at the business of installing wires, conduits, apparatus, fixtures, electrical signs, and or other appliances for carrying or using . . . fire alarms** . . . unless that person, firm or corporation shall have received a license and a certificate for the business, issued by the state board of examiners of electricians of the division of professional regulation of the department of labor and training and in accordance with the provisions set forth in this chapter.
>
> That person shall carry this license on his or her person at all times while so engaged, and **shall affix his or her contractor's license number to any advertisement and/or contract he or she executes and/or to any bid he or she files with any consumer for his or her professional services** and to any applicable permit required for the performance of those services.
>
> Any person, firm or corporation which is required to apply for a permit from a local building official for any work required to be performed by a person licensed under the provisions of this chapter **shall cause the work to be performed by a person licensed under the provisions of this chapter**. (emphasis added).

There is a separate license required for a "fire alarm contractor" and a "fire alarm installer." Id. at 5-6-7. A "fire alarm contractor" is a corporation, firm, or person who, by the employment of fire alarm installers, performs the work of installing, altering and servicing and testing of a fire alarm system in accordance with the Rhode Island Fire Safety Code. Id. at 5-6-1(d). A "fire alarm installer" is a person engaged in installing, altering, or servicing and testing of a fire alarm system used for the purpose of causing an alarm to be sounded in case of fire. Id. at 5-6-1(f). The fire alarm contractor's license, known as Certificate AF, does not entitle the holder individually to engage in the work on alarm wires, but entitles the holder to contract to do

the work through the employment of fire alarm installers holding a Certificate BF. Id. at 5-6-8. The Certificate BF is given to a licensed alarm installer. Id. at 5-6-11. Certificates are not assignable or transferable. Id. at 5-6-23.

At the time P&J entered into all three agreements with the Larrats, it lacked the statutorily required license for fire alarm installation and monitoring. P&J's own installer admitted that P&J was operating without a proper alarm contractors license between 1992 and 2001. P&J was trying to use the alarm contracting license of Jim Governor of JED Electric. However, this practice is specifically prohibited under the alarm licensing scheme. A person can only hold the AF license for one company. Ultimately, the electrical inspector found out what P&J was doing and forced it to obtain its own license. P&J also failed to place its license number on any of contracts executed with or bids submitted to the Larrats as was required by the statute. Id. Absent this state required license, P&J did not even have the capacity to enter into an alarm installation or monitoring agreement. In fact, it was illegal for P&J to enter into any such contracts. Accordingly, the contracts are all void.

In Paul Arpin Van Lines v. Universal Transportation Services, the First Circuit Court of Appeals upheld a declaratory judgment by the Rhode Island District Court that a contract was void because one of the parties lacked a required license. 988 F.2d 288 (1st Cir. 1993). Universal and its principal Michael McGowan (hereinafter collectively "Universal"), entered into a three year contract with a moving company, Paul Arpin Van Lines, to solicit customers and accounts for them. Id. at 289. The moving company sought to have the contract voided because Universal lacked a statutorily required brokers license from the Interstate Commerce Commission. Id.

The court found that the statute was enacted to protect the public from fraud and/or incompetent motor carrier brokers. Id. at 291. While there was no evidence that Universal was either fraudulent or incompetent, the failure to obtain the broker's license could not be "ignored

or forgiven," especially in view of the fact that it had been in the business for a number of years and was aware of the licensing requirement. Id. The court also found that Universal made knowing misrepresentations that it had a license. Id.

Similar to the broker in Paul Arpin Van Lines, P&J was knowingly operating without statutorily required licenses to install and monitor fire alarms and burglar alarms. The Rhode Island licensure requirements were set up to protect the public from fraud and incompetent work. However, unlike Paul Arpin Van Lines, in this case, there is actual evidence that P&J was both fraudulent and incompetent. P&J was fraudulent because it knowingly held itself out as qualified and licensed to do alarm installation and monitoring, despite the fact that it lacked the statutorily required alarm contractor's license. Moreover, as is discussed at length in plaintiff's expert's report, the installation was completely incompetent, which resulted in the failure. The conduct of P&J is exactly what the licensing statute is designed to prevent in protecting the citizens of Rhode Island. Because P&J lacked the required license and certification, the contracts with the Larrats should be void. It would violate public policy to allow P&J to benefit from the exculpatory clauses in contracts that it did not even have the legal capacity to enter into.

### C. ALL CONTRACTS BETWEEN P&J AND THE LARRATS ARE VOID BECAUSE THEY ARE BASED ON MATERIAL MISREPRESENTATIONS BY DEFENDANT P&J

In holding itself out as a certified and licensed alarm company, defendant P&J materially misrepresented itself. The contracts with the Larrats are based on this material misrepresentation and are therefore void. A contract may be rescinded due to a misrepresentation where a plaintiff shows he was induced to enter into the contract by the other party's material misrepresentations of fact. Halpert v. Rosenthal, 107 R.I. 406, 413, 267 A.2d 730, 734 (1970). It does not matter if the representation was innocent or fraudulent, as long as it was material. Id. Misrepresentation has been defined as "any manifestation by words or other conduct by one person to another that,

under the circumstances, amounts to an assertion not in accordance with the facts." Id. A transaction is voidable where a party is induced to enter into it based on the other party's fraud or material misrepresentation. Id. A misrepresentation is material "if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so." Promet Marine Serv's Corp. v. Potter, 1994 R.I. Super LEXIS 58 at *5 (R.I. Super 1994)(quoting Restatement (Second) of Contracts §162). Nondisclosure is the equivalent to an assertion in certain cases, including where a party, "knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing." Id.

In addition to requiring an alarm contractor's license to operate, P&J was also required by statute to have only individually licensed alarm installers handle the installations. R.I. Gen. Laws § 5-6-2. Tom Somers did the first installation at the Larrats' home in 1994 by himself. He admitted that at that time he did not have his Journeyman's or Master's license and that he was only an apprentice.

P&J made material misrepresentations regarding its certification and licensing to do alarm installation and monitoring and also regarding its installers' qualifications and licenses. While it is unclear whether P&J affirmatively told the Larrats that it was properly licensed, even the nondisclosure of its status is akin to a material misrepresentation. P&J held itself out as a licensed alarm contractor and the Larrats were not presented with any reason to believe otherwise. P&J also did not tell the Larrats that its installers were not properly licensed. Accordingly, P&J made misrepresentations through its conduct. Paul Larrat has stated under oath that he believed they were licensed and he would not have entered into the agreements with them if he knew that they were not. Larrat was never aware that P&J was not licensed until it was revealed during discovery in this case. Larrat was induced into entering into the contracts by the misrepresentations by P&J that it was properly certified and licensed to do the alarm

installation and monitoring work and that its individual installers were properly licensed. Accordingly, the entire contracts should be voided.

The consideration for entering into all of the contracts and agreeing to any terms and conditions was the representation that P&J was certified and licensed to do the work and that its installers were all properly trained and certified. It would be inequitable and violate public policy for P&J to benefit from exculpatory provisions in a contract which the Larrats entered into based on the material misrepresentations by P&J regarding its licensure and its installers licenses and qualifications. Had the Larrats been aware of P&J's status, they would have found a licensed alarm contractor to do the work.

### D. DEFENDANT CANNOT EXCULPATE ITSELF OR LIMIT ITS LIABILITY BY CONTRACT FOR GROSSLY NEGLIGENT CONDUCT

Even assuming arguendo, that the contracts are not completely void, the limitation of liability provision relied on by P&J is not enforceable under this particular set of facts because P&J's conduct is grossly negligent. The Rhode Island Supreme Court, like most other courts, has held that alarm companies can contractually limit their liability for negligence. Ostalkiewicz v. Guardian Alarm, 520 A.2d 563 (R.I. 1987); see also E.H. Ashley & Co. v. Wells Fargo Alarm Serv., 907 F.2d 1274 (1st Cir. 1990)(holding that limitation of liability in contract was not unconscionable under Rhode Island law). However, a party cannot limit or insulate itself from liability based on gross negligence or willful and wanton conduct. Newton v. Seahourse Marina, 1998 WL 1017209 at * 2 (R.I. Super. 1988).

In Newtown, plaintiff's boat was damaged while docked at the defendant's marina. Id. at *1. The defendant moved for summary judgment based on exculpatory language in the rental agreement. Id. at *2. The Superior Court held that the defendant could not contractually absolve itself from liability for gross negligence and that summary judgment was inappropriate because there was a material issue of fact as to whether the defendant was grossly negligent. Id. The

court noted that in Rhode Island, gross negligence "demands evidence of near recklessness or shockingly unjustified and unreasonable action." Id. (citing Leite v. City of Providence, 463 F.Supp. 585 (D.R.I. 1978).

While no Rhode Island Court has considered the specific issue of whether an alarm company can contractually limit its liability for gross negligence, courts in other jurisdictions have considered this issue and found that an alarm company cannot waive or limit its liability for grossly negligent or willful and wanton conduct. In fact, many of these jurisdictions have done so in interpreting the same limitation of liability language that defendant P&J is relying on in this case. See Colanghi, U.S.A., Ltd. v. Jewelers Protection Serv's, Ltd., 611 N.E.2d 282, 283-84 (N.Y. 1993)(holding public policy forbids an alarm company from escaping liability, through a contractual clause, for grossly negligent conduct); Sommer v. Federal Signal Corp., 593 N.E.2d 1365, 1370-71 (N.Y. 1992)(same); Federal Ins. Co. v. Honeywell, 641 F.Supp. 1560, 1562 (S.D.N.Y. 1986)(holding public policy voids any provision in an alarm contract exculpating party for gross negligence or willful or wanton conduct); Royal Indemn. Co. v. Security Guards, Inc., 255 F.Supp.2d 497, 507-08 (E.D. Pa. 2003)(holding under Pennsylvania law, a security company's liability could not be limited by contractual provision if there conduct was found to be grossly negligent); Neuchatel Ins. v. ADT Security Sys., 1998 U.S. Dist. LEXIS 17692 at *17-18 (E.D. Pa. 1998) (recognizing that Pennsylvania Federal District Courts considering the enforceability of exculpatory/limitation of liability provisions have uniformly agreed that "a claim otherwise foreclosed or limited would survive if plaintiff could prove gross negligence"); Rosenblath's Inc. v. Baker Indus., 634 So.2d 969, 971 (La. Ct. App. 1994)(holding exculpatory clause in alarm contract did not apply to relieve company from liability for gross negligence); The New Light Co. v. Wells Fargo Alarm Services, 525 N.W.2d 25 (Neb. 1994) (holding limitation of liability provision in alarm contract is not an enforceable limitation on liability for

action based upon gross negligence or willful and wanton misconduct); Bouvier Brothers, Inc. v. Protective Services, 2 Mass. L. Rep. 101 (Mass. Super. 1994)(holding that summary judgment was inappropriate on alarm contract based on exculpatory clause where there was allegation of gross negligence); Fireman's Fund Ins. Co. v. Morse Signal Devices, 151 Cal. App. 3d 681, 690-91 (Cal. Ct. App. 1984)(holding liquidated damage provision in an alarm contract cannot limit liability for gross negligence).

Where a state has yet to rule on an issue, the district court is required to determine how it believes the state court would come out of on the issue. Leon's Bakery v. Industrial Elec. Serv., 990 F.2d 44, 47-48 (2d Cir. 1993). "In making such a determination, a federal court is free to consider all of the resources with to which the highest court of the of the state could look, including decisions in other jurisdiction on the same or analogous issues." Id. In this particular case, the majority of states to consider this issue have held that an alarm company cannot limit its liability by contract for grossly negligent or willful and wanton conduct. In addition, the only Rhode Island court to consider the effect of gross negligence on an exculpatory provision has held that a party cannot contractually exculpate itself for liability for gross negligence. Newton, 1998 WL 1017209 at * 2. Accordingly, this Court must deny defendant's motion if plaintiff can make a showing that there is a genuine dispute of material facts with regard to whether P&J was grossly negligent.

Plaintiff asserts that there are sufficient facts in the record from which a jury could determine that P&J's conduct in installing, servicing and monitoring the alarm system at the Property without the statutorily required licenses was grossly negligent. Plaintiff's alarm expert, Robert Schifiliti, examined the alarm system and found that it was amongst "the worst and most incomplete" he has ever seen. Among the more obvious and glaring problems with the installation, he observed: a nest of cross connected wires inside the control panel, a **Merit**

**cigarette** inside the back of a smoke detector, an improper ground circuit in the main circuit board, and a fuse too small for the system wrapped in **tin foil**. He found that he practices of the company were "lackadaisical and not aimed at quality, safety or even minimum industry standards" and that P&J's pattern of business suggests "a level of gross negligence on the part of P&J." Basically, P&J was collecting fees from its customers with without doing anything to ensure proper system operation or that its installers were properly qualified and licensed.

At the time of the first installation by P&J at the Property, the company lacked the state mandated fire alarm contractor's license to do any business involving fire alarm systems. Moreover, the installers lacked the state mandated alarm installer's license. P&J allowed unqualified and uncertified alarm technicians to do alarm installations in violation of the Rhode Island alarm licensing statutes. Tom Somers, the very person who did the installation, admitted that he was only an apprentice at the time he did the installation and that the installation was extremely sloppy due to his inexperience. He also admitted that the person who was signing out permits for P&J did not inspect his work when he was finished.

There were abundance of obvious problems with the installation and wiring of the fire alarm system and the Property. In addition, P&J made a conscious decision to allow inexperienced, unqualified and uncertified installers to install fire alarm systems and knowingly operated without a state required license for a period of almost ten years. In doing so, P&J displayed a level of egregious conduct that is so reckless and indifferent towards its customers that it should not be entitled to contractually insulate itself from any liability. At the very least, there are sufficient facts on the record to create a genuine issue of fact as to whether P&J's conduct was reckless or grossly negligent.

## IV. CONCLUSION

For all the foregoing reasons, plaintiff respectfully requests that Defendant P&J's Motion For Summary Judgment be denied

Respectfully submitted,

ROBERTS, CARROLL, FELDSTEIN & PEIRCE

BY: ______________________________

Marco Ufiati, Esquire
Ten Weybosset Street – 8th Floor
Providence, RI 02903
Tel.: 401-521-7000
Fax: 401-521-1328

COZEN O'CONNOR

BY: ______________________________

Robert M. Caplan, Esquire
1900 Market Street
Philadelphia, PA 19103
Tel: 215-665-4191
Fax: 215-701-2491

Dated June 28, 2005

**CERTIFICATE OF SERVICE**

I, Marco Uriati, hereby certify that on this 29th day of June, 2005, a true and correct copy of the foregoing was served via regular mail on the following counsel of record:

Craig A Johns, Esquire
Law Office of John T. Madden
475 Kilvert Street, Suite 125
Warwick, R.I. 02886

Marco Uriati, Esquire

rpsa
FIRE PROTECTION ENGINEERS
www.rpsa-fire.com

R.P. SCHIFILITI ASSOCIATES, INC.
P.O. Box 297
Reading, Massachusetts 01867 - 0497
USA
781.944.9300 Fax / Data
781.942.7500 Telephone

# Fire Loss
# Larrat Residence
# 167 Tillinghast Rd
# East Greenwich, RI

## Date of Loss: 13 August 2003

## Preliminary Report

**Prepared & Submitted by**
**R.P. Schifiliti Associates, Inc.**

**Robert P. Schifiliti, P.E.**

**Issued**
**10 May 2005**

## 1. Assignment

Mr. Robert Caplan of Cozen & O'Connor, attorneys for the plaintiffs, contacted Robert Schifiliti of R.P. Schifiliti Associates, Inc. We were asked to participate in the loss investigation focusing our efforts in the areas of smoke alarms, and fire detection and alarm.

This report was prepared entirely by Robert P. Schifiliti and is based, in part, on field observations and on materials and data produced and provided for review and consideration. I will review any new discovery and testimony as it is produced and made available to me. I reserve the right to alter or amend the contents and opinions in this report as I continue to work on this case and review additional material.

## 2. Methodology

Robert P. Schifiliti examined documents produced by the various parties and entities. These documents include investigative reports, deposition testimony, photographs, statements, complaints proposals, invoices and contracts. A meeting was held March 1, 2005 with Paul and Amy Larrat and Attorney Caplan.

This report was prepared entirely by Robert P. Schifiliti and is based, in part, on materials and data produced and provided for review and consideration. I will review any new discovery and testimony as it is produced and made available to me. I reserve the right to alter or amend the contents and opinions in this report as I continue to work on this case and review additional material.

In accordance with accepted scientific and engineering practice, hypotheses were formed to be tested against available data and information. The test hypotheses are designed to determine why the fire department was not contacted by the supervising station monitoring the alarm system at the Larrat residence when the fire occurred. Potential causes were analyzed and an effort was made to determine which were possible and which, if any, were more probable.

## 3. Background

At approximately 9:27 PM on the 13th of August 2003 the fire department received several 911 calls reporting a fire at 167 Tillinghast Road – the Larrat's residence. Fire fighters arriving at approximately 9:29 PM reported that the building was fully involved in fire.

The fire occurred during a storm and neighbors reported hearing lighting in the area.

Fire fighters broke the glass of one of the doors to gain entry. At that time, the burglar alarm began to sound. They were able to search the first floor for occupants, but could not go to the second floor due to heat and smoke.

Fire Marshal Susan L. Hawksley investigated the fire and issued a report. Her report concludes that the fire was accidental and originated in the roof area in the vicinity of the chimney. The probable cause was listed the report as lightning. She also noted that no circuit breakers appeared to have been tripped.

## 4. Fire Detection, Alarm and Signaling System (Nominal System Configuration)

The Larrat residence had a combination fire and security system. At the time of the fire, the control unit, located in the laundry room, was a NAPCO Magnum Alert 1008e panel. There were two keypads on the system at each of two first floor doors.

Fire detection consisted of a System Sensor model 2300 TB smoke detector located on the basement level. On the first floor there was a System Sensor model 2100 D smoke detector located near the entry. A 190 $^0$F heat detector was installed in the first floor kitchen. A smoke detector was reportedly installed in the second floor hallway, but was not recovered after the fire. According to Mrs. Larrat, there may also have been a heat detector on the second floor outside of the master bedroom. All fire alarm initiating devices were reportedly connected to a single zone of the control panel. The security system had several zones serving door and window contacts and motion detectors. There was a siren in the attic.

The house had an existing alarm system when purchased by the Larrat's. That system had one smoke detector in the basement and one on the second floor – none on the first floor. The existing system was not monitored off-premises by a supervising station. The alarm only sounded locally.

In June of 1994, the Larrat's received a proposal from P&J Alarm to update their alarm system. The work was done and invoiced July 5, 1994. According to the P&J invoice, the panel was changed to the NAPCO 1008e and the two keypads were also installed. The two existing smoke detectors (basement and 2nd floor) were replaced with new System Sensor smoke detectors and the kitchen heat detector was replaced. The invoice includes a line item listed as "Install Phone Line Protector". At that time, P&J began charging a monthly fee for monitoring of the alarm system

Late in 1997, the Larrat's put an addition onto the house. A March 23, 1998 invoice from P&J Alarm details changes that were made by P&J to the alarm system. These included adding a new smoke detector on the first floor. For security, they added door and window security contacts and another first floor motion sensor. P&J continued to charge a monthly fee for monitoring the fire and security system.

According to Judy Santa, President and owner of P&J Alarm, monitoring of the Larrat's system was subcontracted by P&J to another company. In 1994 when P&J first started charging for the service, monitoring of the system was done by a company called "Monitoring Service". Around 1996 monitoring was changed to another company, Central Alarm, who continues to provide monitoring services for P&J accounts.

Judy Santa testified that the 1994 and 1998 work was done by Tom Somers, a technician who no longer works for P&J. Mr. Somers testified that some of the 1998 work may have been done by another P&J employee, David Russo.

## 5. Equipment Examination

On January 7, 2004 Robert Schifiliti traveled to the offices of EFI in North Dartmouth, MA to examine evidence retained by EFI fire investigators. The following items were visually examined and photographed. A complete set of photographs has been provided on a CD.

| Item | Description |
|---|---|
| 1 | Fire and security alarm control unit. NAPCO Magnum Alert 1008e |
| 2 | Keypad from near front left door. |
| 3 | Keypad from near front door. |
| 4 | Smoke detector from basement. |
| 5 | Smoke detector front 1st floor entry. |
| 6 | Heat detector from kitchen. |

The control panel was found to have a "nest" of cross connected wires. Figure 1 shows an overview of the panel and wiring. Generally, it is possible to physically trace the wires of a control panel by hand without disturbing them in order to understand how the system is wired and how it might operate. That was only possible to a limited degree with this panel due to the haphazard installation and the number of cross connected circuits inside the control unit. To preserve the evidence, the examination was limited and a protocol has been drafted to permit more detailed examination to trace the wires and understand how the system was wired to operate.



**Figure 1 – Overview of Panel**

A photograph of the back of the first floor smoke detector is shown in Figure 2. A "Merit" cigarette was found between the base and the detector. Tom Somers confirmed that he smoked at the time he worked on the Larrat's system, but that he smoked Marlboro cigarettes. It has not been determined if David Russo, who may have installed the first floor wiring and/or detector as part of the 1998 update, smoked.



**Figure 2 – First Floor Smoke Detector**

Figure 3 shows a close-up photograph of the ground lug on the lower left of the main circuit board. The photo shows four smaller conductors twisted together to make an improper ground circuit. That circuit is connected to a module that may be a phone line protection module.



**Figure 3 – Close-up of Ground Terminal**

Figure 4 shows a close-up of a fuse that is the wrong physical size for the system. Tin foil and copper wire have been attached in an attempt to make contact with the fuse socket. No attempt was made to check if the fuse was blown since that would require removal from the socket.



**Figure 4 – Fuse**

When shown a photograph of the fuse, Tom Somers, the P&J alarm technician that installed the panel stated that it is not acceptable, but that he may have done it. (p112).

Figure 5 shows a mounting screw for the main circuit board with what appears to be another ground wire attached. The wire may be touching the electronic components, which would affect operation of the system. That green wire is connected to a DITEK telephone line transient surge suppression module found hanging loose in the bottom of the panel. The DITEK module is designed to protect the control unit from surges, such as that caused by lightning.



**Figure 5 – Close-up of Lower Right Chassis Ground**

When shown the above photographs, Tom Somers, the P&J alarm technician that installed the panel in 1994 stated that the ground wire was "very poorly terminated" (p135). With respect to the overall wiring of the panel he stated "That particular one is extremely sloppy. Of course, I was an apprentice then" (p136).

## 6. Additional Information and Discussion

Somers started with P&J Alarm in 1991 as an apprentice alarm technician. Paul Santa (co-owner with wife Judy at the time) held the Master's license for the company and was, therefore, the one responsible for all work done by P&J employees. In 1993 Paul Santa died, leaving Judy Santa as the sole owner of P&J Alarm. However, P&J did not have anyone with a Masters license to oversee the work of their employees. According to Judy Santa and Tom Somers, James Governor (Somers uses the name Governo) (not an employee) had a Masters license and would file for permits for P&J Alarm.

Somers obtained his Journeyman's license around 1995 to 1996. He obtained his Masters license around 1997 or 1998, but did not act as the P&J Master license holder until 2001.

This chronology indicates that Somers was an apprentice when he installed the control panel and changed the detectors at the Larrat's house in 1994. According to Somers (p50) Governor, who would have signed for a permit had one been applied for, would not have inspected and signed off on his work in a residential installation.

According to the Larrat's, the attic was accessible by a door off of a set stairs that led to a loft in Eric's bedroom. The attic was large enough to stand up, had a floor and was accessible for storage. The siren for the alarm system was located in the attic.

They also stated that the telephone lines and other utilities entered the house underground from the street to their basement. They had two phone lines in the house. Both lines were present in both the main house and the preschool outbuilding.

At no time on the night of the fire did the fire department receive a call from the supervising station.

## 7. Analysis

Using accepted scientific and engineering methods, it is necessary to hypothesize all relevant possible failure modes. Then, the hypotheses are used to predict the behavior of the system. The failure modes (hypotheses) are tested against the available data to determine if any can be ruled out and which, if any is more probable or even certain as the cause of the failure.

**Failure modes and Hypotheses**

1. Failure to detect fire
   1.1. Detector failure.
   1.2. Failure to provide detection in a place where it could respond before other failures occur.
2. Failure of a detector circuit connecting the detector to the control unit.
3. Failure of the control unit.
   3.1. Internal hardware failure.
   3.2. Software programming failure.
   3.3. Power failure.
4. Failure of control unit to transmit a signal.
   4.1. Programming failure.
   4.2. Failure to capture a phone line.
   4.3. Failure to reach the supervising station.
5. Supervising station failure.
   5.1. Incoming phone line failures.
   5.2. Failure to negotiate successful communications with the local panel.
   5.3. Failure to recognize the account number as a valid customer.
   5.4. Failure to receive a valid event code.
   5.5. Failure to process the alarm.
   5.6. Failure to call the fire dispatcher.

## 7.1. Failure to Detect Fire

The fire department did not hear any alarm sounding until after they broke into he house. At that time, the alarm began to sound. Given the amount of fire and its progression, the second floor smoke detector would likely have sounded by that time. It is my experience that failure of a smoke detector is possible, but unlikely. In addition, it is possible that at some time there was sufficient smoke on the first floor to have activated that smoke detector.

The smoke detector retrieved from the basement was installed at the same time as the one on the second floor. That detector has a back-up heat sensor in addition to the smoke sensor. This reduces the probability of the second floor detector having failed.

## 7.2. Failure of a Detector Circuit Connecting the Detector to the Control Unit

The fire could have progressed in the attic and damaged the circuit to the smoke detector. However, upon entry by the fire department, the siren, located in the attic, sounded indicating that its wiring in the attic had not yet been compromised. It appears from preliminary examination of the evidence that the smoke detector added on the first floor in 1998 was wired using fire rated cable. That circuit appears to be spliced in the panel to two additional circuits that do not use properly rated fire cable in violation of Rhode Island State Fire Safety Code. Nevertheless, melting of the wires

serving the smoke detector would most probably result in a short on the circuit. This system responds to a short as if it were a detector operating. Thus, failure of the wires would probably have resulted in an alarm.

### 7.3. Failure of the Control Unit

The fire department activated the security alarm when the broke into the house. Therefore, it is known that some part of the control unit operated during the fire and hat it had operating power. The power may have been the primary AC power or the secondary battery connected to the system.

It remains possible that some type of hardware failure resulted in fire alarm signals not being properly processed. The poor wiring, ground connections and rigging of the fuse are possible causes that warrant further investigation. It is possible that one or more of these improper installation techniques caused a hardware failure.

Software programming of the control unit remains a possible cause of failure to process an alarm. The NAPCO 1008e is capable of being programmed to operate in many different ways. Alarms can be silent at the protected premises, or sound the siren. They can be programmed to transmit off premises, or to only operate locally. P&J has failed to produce a copy of the program or any documentation of the program they loaded into the panel. Tom Somers, the P&J technician that installed the panel indicated that after connecting the panel, Judy Santa would have used an office computer to call into the panel to do the required programming.

No records have been produced by P&J Alarm to show whether the system had ever been tested in accordance with code, manufacturer's recommendations and general industry practice to determine if it had been properly programmed to respond to an alarm input. A properly planned and executed examination and test protocol will allow this information to be determined in a factual way. The alarm control panel and its memory are witnesses with available information that must be interrogated to determine the facts. The failure to properly program and test a system is a gross violation of code, manufacturer's recommendations and industry practice. It would be fraudulent for a company to continue to collect fees for monitoring a system that was incapable of being monitored.

### 7.4. Failure of Control Unit to Transmit a Signal

As noted above in 7.4, improper programming is a possible failure mechanism.

Activation of the security sensors should also have resulted in an alarm transmission to the supervising station. Mrs. Larrat recalled having a problem where the slamming of a door would result in activation of the system. She thinks that the supervising station may have called to verify the alarm. This indicates that it may have been possible, at one time, for the system to reach the supervising station – at least for certain types of alarms.

To communicate with a supervising station, the panel must be programmed to send the particular signal, it must have the proper account code programmed, it must sense and capture a phone, it must have a phone number programmed and it must dial that number. With the exception of actually having a working phone line connected, all are possible failures in programming.

The phone number (if any) programmed into the NAPCO panel should have been recorded on the programming worksheet for the system. The manual and programming worksheet provided by P&J Alarm during discovery is blank. It is necessary to download or read the program from the panel to determine if the correct supervising station receiver phone number had been programmed into the panel.

In 1994 when P&J first started charging for monitoring of the system they subcontracted the monitoring to a company called "Monitoring Service". Around 1996 monitoring was changed to another company, Central Alarm, who continues to provide monitoring services for P&J accounts. It is possible that the Larrat's panel was never reprogrammed to dial the new monitoring company. It is also possible, that reprogramming was attempted, but not successfully implemented. Somers testified that Judy Santa programmed the systems from a computer at her office. The fire alarm code and general industry practice requires that a system be tested after reprogramming to ensure that he change was successful and to determine if any other features had been inadvertently altered. Records of these tests have not been produced by P&J. Another method for changing supervising stations is to implement a call forwarding system. P&J has not produced any record, despite requests, that indicate this to be the case.

There has been speculation that the use of Cox Communications as a telephone service provider may have resulted in problems wit the panel's ability to dial out to the supervising station. The loss of a telephone line should cause the control unit to go into trouble mode, sounding a local buzzer and displaying a fault on the keypads. The Larrat's report no such problems prior to the fire. Also, P&J installed a phone line protector that, if properly installed and connected, would result in a full alarm at the house, even if the phone lines were cut or disconnected.

In addition, P&J installed a DITEK transient voltage suppressor for protection of the phone line. The exact operation of the suppressor and the protector depend on how they were connected. If properly connected, operation of the suppressor due to lighting or some other fault would have caused an open circuit. That in turn would be sensed as a cut phone line and resulted in a trouble signal and a full alarm at the house. To properly assess the how the system was interconnected it is necessary to de-tangle the nest of wires in the control panel. Similarly, to properly assess the condition of the DITEK suppressor, it is necessary to remove it and open it for examination. Testing may also be required.

It appears that the control unit was connected to only one phone line, although two were available in the house. Better examination after detangling the mess o wires in the panel will allow this to be checked. A second phone line would act as a back-up to the first in the event of line failure. Another method of phone line backup would have been the use of cellular technology for the second line. Judy Santa testified that this was an option that P&J could have offered. There is no evidence that his option was ever discussed with or offered to the Larrat's.

The NAPCO panel can be programmed to test the phone lines by dialing out periodically and sending a test signal. It is necessary to download or read the program from the panel to determine if this feature had been enabled.

The poor wiring, ground connections and rigging of the fuse are possible reasons for a failure to transmit signals that warrant further investigation. It is possible that one or more of these improper installation techniques caused such a failure.

### 7.5. Supervising Station Failure

Judy Santa has testified that the supervising station has told her that they did not receive any signals. At this time, P&J Alarm has not produced any supervising station records that would allow us to independently determine if signals or alarms were received or if the system was even capable of receiving signals. In fact, it is not known if the supervising station even had the Larrat's system information in its database at all since no records have been produced.

It is not uncommon for a an alarm system to dial into a supervising station, and then try to report an alarm but have the supervising station software not recognize the signal due to improper programming. This occurs most often when monitoring of an alarm is changed from one supervising station to another.

When a protected premises system dials up a supervising station the two systems "negotiate" in the same way that two fax machines negotiate. They send and receive standard test messages to determine if they can reliably communicate at different speeds or baud rates. When they arrive at a mutual agreement, the digital alarm communicator (DACT) at the protected premises sends and account code. That account code must be in the correct format (programming at the panel) and it must exist in the supervising station's receiver database. In addition to the account code, an event or alarm code is sent. That code must also be in the correct format and must also be set up in the supervising station software.

Other failures at the supervising station, such as the failure to properly process the signal and to call the fire department are dependant on the success of all preceding events. Nevertheless, they remain as possibilities that require checking of the supervising station records.

## 8. Opinions & Conclusion

The testimony of Judy Santa and Tom Somers show that P&J Alarm permitted inexperienced persons to plan and install systems without the supervision required by Rhode Island licensing laws. The extremely poor wiring and rigging of the control panel are evidence of this. The manner in which they programmed and tested systems leaves open the possibility for many of the possible faults to go undiscovered.

These patterns of business suggest a level of gross negligence on the part of P&J alarm, indicating their desire to collect fees without the burden of ensuring proper system operation. The codes and industry standards are clear that systems must be retested when changed or reprogrammed. Nevertheless, P&J has no records of such tests and no documentation of programming.

At this time, it is not possible to rule in or out all of the causes and failure modes listed in section 7 above. To complete the proper testing of the hypotheses at least three tasks remain:

1. Untangle and trace the nest of panel wires.
2. Examine and possible test possible faults in the equipment caused by the poor installation.
3. Download the memory of the control unit.
4. Obtain the record of the supervising station.

For example, the fact that the fire department indicated that the system first operated when they broke into the house, combined with Santa's testimony that no signal was received, would point to a failure to transmit to or receive the signal at the supervising station. However, readily available records from the supervising station that might support or refute her testimony have not been produced despite being requested. Similarly, the fire department report would suggest that the system worked for security but not for fire detection. However, this could result from improper programming or installation or even the haphazard wiring and rigging of the control panel.

Because many of the failure modes are dependant on how the system was programmed and on the success of a previous event, they can not be ruled in or out as possible causes of a failure to get information to the fire dispatcher. It is my opinion that the installation done by P&J Alarm is among the worst and most incomplete that I have experienced. The practices of the company appear to be lackadaisical and not aimed at quality, safety or even minimum industry standards.

**END OF PRELIMINARY REPORT**

Respectfully submitted,
R.P. Schifiliti Associates, Inc.

Robert P. Schifiliti, P.E..
President

**In The Matter Of:**

*Vermont Mutual Insurance Company v.*
*P&J Alarm Company*

---

*Thomas Somers*
*March 30, 2005*

---

*Reporting Associates*
*10 Dorrance Street*
*Westminster Square Building Suite 617*
*Providence, RI 02903*
*(401) 351-1660*

*Original File 032905RC.TXT, 178 Pages*
*Min-U-Script® File ID: 2644848328*

**Word Index included with this Min-U-Script®**

Page 10

slowly. To obtain the fire alarm license —
A: Yes.
Q: — there are certain requirements that need to go into that to obtain that?
A: Yes.
Q: And that includes a four-year apprenticeship?
A: Yes.
Q: Did you complete that?
A: Yes.
Q: When was that completed?
A: Not sure of the year. I don't know.
Q: Was it more than four years ago?
A: Yes. Well, I don't know. Let me see. What — it would be, yes, it would be.
Q: Was it —
A: Hold on. I believe I began my employment March of '91, so it would have been around '95 or '96 that I got my Journeyman's from after having started my apprenticeship for the beginning of employment at P&J Alarm.
Q: So you believe that you began your employment with P&J Alarm in or around March of 1991?
A: Yes, I believe that is the correct date.
Q: Okay. And you would have had to apprentice for four years?

Page 11

A: Yes.
Q: Which would have taken you to, you said, either '95 or '96?
A: Because it doesn't mean I took the test right away after the four years. I'm not sure.
Q: So you don't automatically obtain a Journeyman's license at the end of the four-year period. You have to take a test. Correct?
A: Correct.
Q: Okay. Do you recall — strike that. Did you take the Journeyman license test?
A: Yes.
Q: Did you pass?
A: Yes.
Q: Did you pass on the first attempt?
A: Yes.
Q: When was that test taken?
A: That's what I was just saying, '96, '95. It would have been '95 or '96, yes.
Q: Okay. All right. Now, after you passed the Journeyman's license test, is there any other requirement before you obtain the electric fire alarm corp. Master's license?
A: There's a different between a corporation license and a Master's.

Page 12

Q: Did you obtain a Master's license?
A: At some point, yes.
Q: At some point. Do you have your Master's license with you?
A: This is the Master's.
Q: This is the Master's license.
A: Well, there's a difference. Your Master's, you're either going to hold — and this is going to be some of Judy's problems because she didn't do it right, let me tell you.
MR. JOHNS: Move to strike.
A: Okay. In any license an AF is a Master's, and then you can incorporate your license, an AFC, so when a permit is taken out it's taken out in the company's name and not the individual's name. You can hold either one you want, but you need to go to the Secretary of State and incorporate.
Q: Okay.
A: So — all right?
Q: I think I understand.
A: I held the Master's, but I did not hold the license for the shop. I did not hold P&J Alarm's license that they were running under.
MR. JOHNS: Move to strike. Nonresponsive.

Page 13

Q: Does an alarm company need to hold a Master's license to operate?
A: Yes.
Q: I'll get into this in more detail, but did P&J Alarm hold a Master's license when you were working for them?
A: I don't know.
Q: But if they did it would not have been your Master's license.
A: That's correct. I held it for one year only, in the year 2001.
Q: You held a Master's license for P&J —
A: I held the corporate — in order for the corporation to exist as an electronic fire alarm corporation and to work in the state of Rhode Island, I held the license for the period year 2001.
Q: Okay. And was that a request made by Judy Santa of P&J?
A: Yes.
Q: Did she make you the secretary of the corporation —
A: Yes.
Q: — for that purpose —
A: They —

Page 14

Q: — of holding —
A: They had a problem.
Q: What was the problem? What was the problem that she had?
A: Well, I don't know whether you're aware or not, her husband dropped dead in 1992.
Q: I'm aware of that.
A: Okay. Well, there went the license for the corporation to do fire alarm work. She held a burglar alarm license that continued her to do burglar alarm work only.
Q: So is it your interpretation that they were operating —
A: They obtained a license —
Q: Okay. Let me — I appreciate you giving me this information, but I want to make sure I have it correctly. Let me try to summarize what you said. In 1992 — I believe his name was — Paul Santa died.
A: Right.
Q: And it's your understanding he was the president of P&J Alarm at that point in time?
A: Correct.
Q: And he held the Master's license for P&J?
A: Yes.

Page 15

Q: And that was a Master's license for fire, —
A: Yes.
Q: — installation of fire alarm systems?
A: I don't know whether he was holding an AF or AFC. He was holding one of the two.
Q: It's your understanding if it was just an AF that the corporation couldn't properly operate?
A: It could still operate, but the corporation would not be able to obtain a permit under the name P&J Alarm. They would have had to take it out under Paul Santa, which would have been allowed.
Q: I understand. Okay. But as you sit here today you don't know whether or not he had an AF or an AFC; correct?
A: Correct.
Q: And you never physically saw his card to know one way or the other?
A: No. He was dead within a year, so.
Q: So after 1992 did P&J Alarm still exist as a company?
MR. JOHNS: Objection.
Q: Was P&J Alarm in business after 1992?
A: Yes.
Q: And it's your understanding that after 1992 they did not hold a Master's license in fire alarm

Page 16

systems?
A: The license —
MR. JOHNS: Objection. You can answer.
A: The license was held by somebody else.
Q: Who was it held by?
A: Jed Electric.
Q: Jet Electric?
A: J-E-D Electric.
Q: Is that the burglar alarm license or the fire alarm license, when you say "the license," or both?
A: He would have been holding and had been made an officer in the corporation in order to hold the license for P&J Alarm. He had to have been made an officer, Jim, and which officer position he was given, I don't know.
Q: That's Jim who?
A: Jim Governo with an O.
Q: Jim Governo?
A: Yes.
Q: You don't know whether or not he was made an officer?
A: He had to be because permits were taken out under P&J Alarm Corporation, so P&J Alarm Corporation still, electronic fire alarm corporation still

Page 17

existed after Paul's death.
Q: Yes.
A: Jim Governo held the license for a period of time or quite a long time.
Q: Do you know if the license that was held on behalf of P&J by Jim Governo was obtained immediately after Paul's death, or did they do work without?
A: The work never got interrupted.
Q: The work never got interrupted?
A: No. I went to work the very day of his death.
Q: All right. Were they working for some period of time without a Master's license?
A: I don't know how the State interprets when a license terminates, if they take it away, because I don't know if the State interprets if the Master's dead don't do the work. I — that's not my department. I don't know the answers.
Q: Do you know whether or not it was a violation of Rhode Island alarm codes to have the license held by Jim Governo for P&J?
A: What's the question again?
Q: Do you know whether or not the license that was held by Jim Governo for P&J violated any of the provisions of the Rhode Island alarm code?
MR. JOHNS: Objection.

Page 18

Q: You can answer. Do you know if it was okay for them to pull permits under his license?
A: It was okay to pull permits under his license. That's a different question. Do you want me to answer the prior question?
Q: I do want you to answer the prior question.
A: Could you repeat it.
Q: Do you know whether or not it was a violation of any of the Rhode Island alarm codes for P&J to operate or pull permits under Jim Governo's license?
MR. JOHNS: Objection.
A: I don't know all the answers to it, but I do know that in 2001 they were caught with the methods that they were using to hold licensing and told that it was not allowed.
MR. JOHNS: Motion to strike.
Q: Okay. I think the answer was responsive, but let's explore that a little bit further. We're sort of going, we're on a tangent now and I'm going to bring it back so it's a little bit clear. But I do, while we're talking about it, I want to ask some more questions.
A: Yup.
Q: In 2001 you said that P&J was caught?

Page 19

A: Uh'huh (affirmative).
Q: Okay. Yes?
A: Yes.
Q: Okay. Who caught them and what?
A: The Pawtucket electrical inspector.
Q: All right. And who was that?
A: I don't know his name. He's now the Chief Electrical Inspector for the State. I forget his name. He was Pawtucket for years and years and years.
Q: And what did he catch P&J doing?
MR. JOHNS: Objection. Any time I object, Mr. Somers, you can answer the question. I'm just placing an objection on the record.
THE DEPONENT: All right.
A: Say that again, now, because I don't remember the question now.
MR. CAPLAN: Can you read the question back.
(Pending Question was repeated by the stenographer.)
Q: In 2001.
A: My understanding from what I hear of the situation, what I was told, is that Jim Governo was, being Jed Electric and P&J Alarm, holding two

Page 20

licenses for two companies simultaneously, and you're not allowed to do that. And then she approached me, she had 30 days to get a license or something or stop, you know, just cease to exist or whatever they want you to do. But I was not aware that they had a licensing problem. I knew nothing about how they obtained their licensing until they approached me in 2001.
Q: Just so you know, to give you a comfort level, this case is a civil case for damages arising out of a fire. There is nothing that you're going to say here that I'm trying to elicit to implicate you in anything. I am just trying to find out facts behind your employment with P&J and the background surrounding your employment, as well as the installation of the alarm systems at their residence. Okay?
A: Uh'huh (affirmative).
Q: So from that perspective, I understand where you're coming from, you're testifying truthfully under oath and I appreciate that. You don't have to be afraid to answer the questions. I'm not — this is not a criminal proceeding. It's not anything like that. All right?
A: I did my time. I took my test. I understand.

Page 21

Q: Okay. Now, to summarize, it's your understanding that in 2001 P&J Alarm was approached by an inspector from Pawtucket because they were operating under a license that was being held by two separate companies.
A: No, that's not correct.
Q: Okay.
A: The individual holding the license was operating two companies.
Q: His own company?
A: His own company, —
Q: And —
A: — Jed Electric.
Q: Do you know, by the way, if Jim Governo was being paid by P&J?
A: No, I don't.
Q: You don't know. Okay. And you don't know whether or not he was, in fact, an officer, but you believe he would have had to have been an officer?
A: Right. When I, I only, I know from my experience of having to hold a corporation's license that I had to be made an officer in the corporation.
Q: Okay. And at some point in 2001 they were told that they could not operate that way, they would

Page 22

have to cease operations unless they obtained their own master license?
A: A new master, somebody that was actually in the shop, yes.
Q: And you were approached by Judy Santa?
A: Yes.
Q: And that point in time you did hold a Master's license?
A: Yes.
Q: And when you were approached what did she ask you or tell you about the situation?
A: Well, I mean it happened so, I don't know, she just hurried, hurriedly told me that she needed my license and for me to sign some paperwork or something. I guess she was trying to push me through the Secretary of State, and that's when she had told me that I guess Pawtucket's electrical inspector realized that, you know, the methods which they obtained their licensing actually you're not supposed to do, so.
Q: Do you know —
MR. JOHNS: Move to strike.
Q: Do you know whether or not P&J was ever sanctioned by the State of Rhode Island for the way they operated?

Page 23

A: No, I have no idea.
Q: Go ahead.
A: And then I mean without any real discussion or offer of compensation she wanted me to take on the full responsibility of the corporation, like hold the license for the corporation, and that means all the jobs are mine at that point, basically, because I'm the one signing the permits to do the jobs.
Q: Did you have an AF or an AFC at that time?
A: An AF.
Q: Just an AF?
A: Correct.
Q: Was there any contemplation at that point in time or did Judy ask you to get an AFC?
A: Well, that's what she wanted me to do to carry the corporation; otherwise, the corporation becomes defunct and doesn't exist anymore.
Q: Did you, in fact, carry the corporation?
A: Yes, I signed all the paperwork. It's my license, identical to this one, said P&J Alarm, but it didn't say Thomas Santa, President. It actually just gave the address.
MR. CAPLAN: The witness is referring to the Electric Fire Alarm Corp. license that we'll

Page 24

have marked. I'm going to ask that a copy of this be made and we'll have it marked as an exhibit, front and back.
And by the way, the two licenses, the Electric Fire Alarm Corp. license and the Telecom System Contract license are two-sided cards, one with a photo ID — both with photo ID on the back. And the Contractors Registration Board is more in the line of a credit card, plastic. The other two are laminated paper cards.
Q: All right. Based on your understanding of what Judy Santa wanted you to do on behalf of P&J, is it your interpretation that from the period of time that Paul Santa died, to the period of time where you became the designated holder of the AFC, that they were operating incorrectly?
A: I had no idea of that.
MR. JOHNS: Objection.
Q: I understand that you don't, didn't know whether or not, but what you know now, knowing that you can't hold, —
A: Yeah.
Q: — would it be your interpretation, being in the industry, that they were operating improperly —
A: Yes.

Page 25

Q: — for that time period?
MR. JOHNS: Objection.
A: Yes.
Q: And that would be the time period from 1992 through 2001?
A: Uh'huh (affirmative).
MR. JOHNS: Objection.
Q: Yes?
A: Yes.
Q: Now, you mentioned that you were uncomfortable with the situation because all of the permits were going to be pulled under your license.
A: Right. And I have no idea whether she has insurance or anything. It's like, you know, I have no say how the company operates. She's operating the company, she's the president, you do everything she tells you to do, and you have no decisionmaking. You just are — basically I go out and install and the installations are completely her choice, so it's like I didn't want the responsibility. I didn't like the way that things were handled, testing was done. I was not, uh'uh (negative).
MR. JOHNS: Objection. Move to strike.
Q: Were there problems with the way things were done

Association, or somebody like that. There was
some credit things that you had to earn in order
to obtain your burglar alarm license there.
There's some kind of, there were some, there was
some training required to get your burglar alarm,
or as far as I know.
Q: Did you ever obtain and hold a burglar alarm
license?
A: Yes.
Q: When was that?
A: I don't know.
Q: Sometime after 1991?
A: Yes.
Q: Is it the same type of training required to obtain
your AF?
A: No.
Q: It's not. It's something less than that?
A: Yes.
Q: There's no four-year apprentice required?
A: There is nothing. You need somebody — it's
basically to insure that people doing security
have a background check, an alarm license.
That's it. You can get it immediately.
Q: You no longer hold that license?
A: Correct.



Q: Why not?
A: Well, Judy had it taken away from me.
MR. JOHNS: Objection.
Q: And how did Judy have it taken away?
MR. JOHNS: Objection.
A: In the end when this whole licensing thing deal
fell apart she never followed, thank God, through
with signing over the company, as we agreed, and I
quit and I popped out a few alarms into the
central station and then so she had me arrested,
blah, blah, blah, and they took my license for
the burglar alarm.
Q: They took your burglar alarm license?
A: Yes.
Q: The State?
A: Yes.
Q: Did you also lose for any particular —
A: No, no.
Q: Let me finish the question. Did you also lose
your fire alarm license for any time period?
A: No.
Q: And that's been maintained?
A: Yes. She lost her license the day I left, —
MR. JOHNS: Move to strike.
A: — her fire alarm license.

MR. JOHNS: Move to strike.
Q: What was the day you left P&J's employ?
A: December 14th, 2001. Yes, 2001, yeah, it was
December 14th.
Q: Do you know if they continued to pull permits
after that?
MR. JOHNS: Objection.
A: No, I don't.
Q: Do you know whether or not P&J stayed in business
to install alarm systems and to monitor systems
after December 14th of 2001?
A: What kind of systems?
Q: Burglar and fire alarm systems.
A: My understanding to the whole situation, because I
called the Secretary of State, she's listed as
every officer in the corporation. So she's not
supposed to do fire alarm work, but I know she's
continued to do fire alarm work because she does
quarterly inspections with no license.
MR. JOHNS: Objection. Move to strike.
Q: Is that a violation of Rhode Island alarm code to
do quarterly inspections without an alarm license,
fire alarm license?
A: Yes.
MR. JOHNS: Move to strike.



Q: Do you know if she continues to do that today?
A: Yes.
MR. JOHNS: Objection.
Q: If she's listed as every officer in the
corporation, she doesn't hold a Master's license,
fire alarm license, then she can't pull permits.
Correct?
A: That's correct.
Q: The person who pulls permits must be an officer?
A: That's correct — no.
Q: The person who holds the license must be an
officer.
A: Correct.
Q: That's what I meant. Go ahead.
A: An individual can still pull a permit without
being a corporation or anything else. She can't
do fire alarm work because if she's listed as
every officer in the company, that company should
not be doing any fire alarm work period. She
can't obtain quarterly inspection sheets from the
State anymore unless she has either an AF or AFC
are the only licenses allowed to get State
compliant inspection forms now. The State, no
longer can you make your own quarterly inspection
sheets and send them in to the State. They

changed that law. And so I was very interested to know whether she, how she's been doing her fire alarm work myself.
**MR. JOHNS:** Move to strike.
A: Not for nothing.
Q: Other than the incident where you left the company and were arrested for, I believe, issuing or sending false burglar alarms —
A: Yeah, she had me charged with fraudulent use of the corporate credit card, which was dismissed. Embezzlement, which was dismissed.
Q: Anything else?
A: No.
Q: Some of the alarm companies, panel manufacturers, gave you some courses. Is that correct?
A: Yes.
Q: All right. How about any of the fire alarm product manufacturers. Did they provide any courses to you?
A: Some — if you're doing installation of fire alarm products in the state of Rhode Island every installation requires a manufacturer certificate of knowledge of the panel, or its representative to get a system inspected and passed through the State of Rhode Island. So, yes, I took courses.



Your product line you're usually certified in.
Q: Who trained you at P&J? Was it Paul Santa?
A: Until he died.
Q: So it was approximately a year?
A: Yes.
Q: Did you do any installations by yourself in that year?
A: Yes. During the first year?
Q: Yes.
A: Yes.
Q: How about in the first four years before you took your Journeyman's license?
A: Yes. But that's —
Q: Go ahead.
A: You need to clarify the installations between burglar — there's two licenses now running here and two different types of installations. One I can be on immediately and the other I can't be on alone.
Q: Why don't you clarify.
A: Because you've been asking me did I do installations, but the very first day I go work there I can do work on a burglar alarm installation myself without, I guess the State requires you get a burglar alarm license, but you



can still be out there doing the work.
Q: But a fire alarm is different?
A: Absolutely.
Q: All right. Now, are you entitled to install a fire alarm license by yourself before you obtain a Journeyman's license?
A: ~~You can't even install them by yourself with a~~ ~~Journeyman's.~~ You need a Master's. Only a Master can sign off on an installation or get a permit or do the plans or do the pre-acceptance paperwork required by the State.
Q: And that's for fire alarms?
A: Correct.
Q: Did you at any point in time while working for P&J, before you obtained your Master's license, install a fire alarm system by yourself?
A: I wouldn't have been able to do the whole installation myself because it required a Master.
Q: My question is did you anyway.
A: Did I...
Q: Did you install a fire alarm system by yourself even though you didn't hold a Master's license?
A: Me?
Q: Yes.
A: Yeah, I've worked on job sites with my licensing,



correct.
Q: My question is —
A: As an apprentice I worked on, correct, I worked on installations.
Q: By yourself?
A: No, what do you mean by myself?
Q: Where no other Master was present.
A: There was never a Master in the shop after Paul's death until I became a Master.
Q: All right. And that, again, was what year?
A: 1992.
Q: In 1992 you became a Master?
A: No, no. Paul died in '92.
Q: I know what year he died. What year did you obtain your Master's license?
A: I never gave my Master's license to the shop until 2001. The only year my license was used for P&J Alarm was the year 2001, the Master's.
Q: I'm trying to find out when you obtained it, regardless of when P&J used it.
A: My Master's?
Q: Yes.
A: I probably took my test in around — just check State records — it was probably 1996.
Q: 1996?

A: Yeah. Six years after I started there, so, well, '97, maybe. How many years — '91, because immediately we went, I took my license. Believe me, we were down there, she had me taking my license, because they were running the shop.
Q: Without one?
A: Oh, yeah.
Q: Okay. Now, just so I have my chronology straight: You started working for P&J in 1991.
A: Correct.
Q: You told me that you believe — you apprenticed for your four years and you believe you took your Journeyman's test either in 1995 or 1996?
A: It would have been — yeah, '95, '96 I would have taken my Journeyman's test.
Q: Okay. And since you passed the first time you would have obtained your Journeyman's license at that point in time?
A: I held an apprentice four years before, correct.
Q: Held an apprentice, and then you became a Journeyman.
A: Two years after that I would have taken my Master's immediately, so.
Q: So it would have been either in 1997 or 1998 —
A: Yeah.



Q: — that you would have obtained your Master's license?
A: Yes.
Q: And, again, that was AF for you under your name, not under the corporation's name.
A: Correct.
Q: Not under P&J's name.
A: Correct.
Q: But as we follow the chronology, in 2001 that was the first time your Master's license became an AFC on behalf of P&J Alarm Company.
A: Correct.
**MR. CAPLAN:** Can we take a five-minute break.
(Short break taken.)
**(COPY OF SUBPOENA ISSUED TO THOMAS SOMERS WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT** NO. 1 FOR IDENTIFICATION.)
**MR. CAPLAN:** We're back on. Just for the record, we've identified Mr. Somers's subpoena as Plaintiff's Exhibit 1; the Fire Alarm Corp. license, front and back as Plaintiff's Exhibit 2; the Telecom Systems Contract license, front and back, as Plaintiff's Exhibit 3; and the Contractors Registration Board license as Plaintiff's Exhibit 4.



**(ELEC FIRE ALARM CORP LICENSE OF THOMAS SOMERS WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S** EXHIBIT NO. 2 FOR IDENTIFICATION.)
**(TELECOM SYS CONTRACT LICENSE OF THOMAS SOMERS WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S** EXHIBIT NO. 3 FOR IDENTIFICATION.)
**(CONTRACTORS REGISTRATION BOARD LICENSE OF THOMAS SOMERS WAS RECEIVED IN EVIDENCE AS** PLAINTIFF'S EXHIBIT NO. 4 FOR IDENTIFICATION.)
Q: After Paul Santa's death who trained you in alarm installation, fire alarm installation? And why don't we limit from here on in fire alarm installation when I say "alarm installation."
A: All right.
Q: All right? Who trained you in fire alarm installation after Mr. Santa's death?
A: Just taking classes from different manufacturers and different, well, like supply houses, ADI, Ademco Distribution, Incorporated would do seminars.
Q: Okay.
A: We had an extensive client base.
Q: After Mr. Santa's death P&J did not have any Master's license personnel. Correct?
A: What do you mean? I don't know what you mean.
Q: No one working at the company maintained a Master's license in the period of, from the period of 1992 through the period where you obtained your



Master's; right?
**MR. JOHNS:** Objection.
A: Sure, they had a Master's license.
Q: Anyone doing installations?
A: Jim Governo helped with some of the installations.
Q: Is that while he still held his Master's license on behalf of Jed Electric, as well?
A: Yes.
Q: What percentage — when you say he helped on some of the installations, what percentage of installations did he help on before 2001?
A: The whole period?
Q: Yes.
A: Five percent, maybe, at the most.
Q: Five percent? Did anyone else with a Master's license have help with installations other than Jim Governo, before you obtained yours?
A: No.
Q: While you were apprenticing in that four-year period, did you install fire alarm systems?
A: Yes.
Q: Okay. When you installed those fire alarm systems during your apprentice period, did you ever do it by yourself?
A: Yes.

Page 50

Q: After completion of the installation of those fire
alarm systems would Jim Governo have to sign off
on them?
A: Depends what kind of fire alarm.
Q: How about a residential system?
A: No, depends, totally up to Judy what she's doing.
She doesn't want to go the right route, that's her
business.
MR. JOHNS: Move to strike.
Q: Okay. Would the right route, the route required
by Rhode Island alarm codes, have been that
someone holding a Master's license would have to
sign off on the installation of a fire alarm
system in a residential setting?
MR. JOHNS: Objection.
A: Sure. The fire department. The Town would sign
off on it.
Q: Were there instances where Judy didn't go the
right route, as you've described?
MR. JOHNS: Objection.
A: I think, I believe that you don't — you have a
misinterpretation as to fire alarm codes in the
State of Rhode Island because this license does
not pertain to anything less than a three-family
house.

Page 51

Q: Okay.
A: Well, it does. I'm sorry; that's not true, okay?
But the rules change dramatically when it's above
a three-family house for the use of the license
because, one, the — it's so hard to explain.
This is what makes it so risky about doing
business in Rhode Island because even the State
doesn't have clear answers on this stuff. Okay.
Go ahead and ask your questions again because I
don't know —
Q: You're the person with knowledge in this area —
A: Right.
Q: — and I'm just asking the questions, —
A: Go ahead.
Q: — so any time you can —
A: There's a difference between a single family
residential when Judy's coming in and what we did
in this particular house that burned, and, and
doing a commercial fire alarm, what would be
considered a commercial fire alarm system. I
mean there's, she — I mean she goes ahead and
sends you a certificate saying that that house is
monitored for property protection under the fire
alarm system installed, you bet your butt it
better meet code for the State because otherwise

Page 52

you're putting a substandard system in. But
that's exactly what was done here.
MR. JOHNS: Move to strike.
Q: How do you know that that was done here?
A: I don't even believe there was a permit taken out
to do that job, if I'm not mistaken.
Q: How would you know that? Would you be able to see
that from any of the proposals or invoice
documents?
A: No, you wouldn't. Depends on what you subpoena
from her. If you subpoenaed all of the records
that would have pertained to this customer, she
would have that copy of the permit in file.
Because it cost money, $35 or whatever.
Q: Just for the record, I did ask Judy Santa for all
records on this account and she's indicated that
the majority of them were destroyed and that she
did not hold them. Do you have any information
of where the records of this type may have been
kept?
A: She has a filing system in her basement that has
all the records since day one, all our client
base —
MR. JOHNS: Objection.
A: — kept in two yellow, three yellow file cabinets,

Page 53

and she was very very good at keeping records.
MR. JOHNS: Objection.
Q: And you would know that information, having been a
former employee and officer of P&J?
A: Pertaining to this particular file?
Q: Pertaining to the —
A: General files?
Q: General files.
A: Yeah, we were very very — she has a very good
system. I mean she's run a company for a very
long time, and we have to service these accounts,
so keeping very clearcut records of everything
that we've done on these accounts, wire ledgers,
where panels are, permits, are kept in a file
cabinet, because as the years are going by and
you're calling in, what was done, where's the
panel? I'm on a service call, haven't been there
in eight years. She'd just go to the records,
pull it out; Hold on, let me see what we got on
this customer. She doesn't lose her records.
(Interruption by the stenographer.)
MR. JOHNS: Objection.
Q: It's been your experience knowing her that she
takes care of her records very well?
A: Yes. It's easy to find out if there was a permit

Page 54

taken out. You just go to the town hall and ask that particular date of installation. They would have a record of it. It's a city hall record.
Q: So your job at P&J would not have been to pull permits for jobs?
A: Correct.
Q: Did any of the installers pull permits?
A: No.
Q: That was Judy's job?
A: She couldn't pull a permit for a fire alarm. Only Jim Governo could.
Q: So Jim Governo would have pulled all permits —
A: Pertaining to fire.
Q: — pertaining to fire from the period of time that Paul Santa died until the period of time where your license became the license of P&J in 2001?
A: That's correct. The one thing I do not know is if he gave her power of attorney for signature on permits, because I did not. You can give power of attorney, you know what I'm saying, on a corporate license, and I did not let anyone sign except me.
Q: And why is that?
A: It's my license.
Q: And it's your —
A: It's my decision.

Page 55

Q: And your reputation —
A: That's right.
Q: — if there's a problem —
A: Correct.
Q: — with the job?
A: Correct.
Q: What was your job description with P&J? Were you labeled as an installer?
A: I was the man.
Q: You were the man. Okay. Were there any other installers?
A: Yes.
Q: Who were they?
A: David Russo.
Q: What period of time —
A: Wait.
Q: I'm sorry.
A: Okay. David Russo was one of the installers. There were other people who worked for the company.
Q: I was just asking about installers.
A: Yeah, I mean everybody else who worked for that company was an installer. Judy Santa, Paul Santa, they ran the office, and then everyone else just did installation. That's how it works.

Page 56

Q: Did Judy do any installations?
A: No.
Q: Paul did do installations before his death.
A: I'm sorry?
Q: Did Paul Santa do installations before his death?
A: Yes.
Q: From 1991 through 2001, other than yourself and David Russo, how many other installers were there?
A: That she paid under the table? Mike — that would have been on the books, Mike.
MR. JOHNS: Move to strike that "under the table" stuff.
A: That's why I left. I don't remember Mike's last name.
Q: Okay.
A: He worked — I'm unsure; he left very close to the period of time around Paul's death. They laid him off, so he was the first person they ever laid off. Paul may have still been alive, with Mike. Then David Russo came along, he was from Cumberland, but I'm not sure of the year. I worked alone from the time Paul died for quite a period of time.
Q: Several years?
A: Not even because just the workload is too big. I

Page 57

don't remember if David was there on Paul's death or not. I'm not sure if we hired David after Paul. I can't say.
Q: Was David Russo a licensed —
A: No, he had no experience prior to coming into that business.
Q: Did he obtain any type of licensing?
A: I don't know. You have to check the State records. That I don't know.
Q: Did you ever — do you know if he got Master's license?
A: No, that he never did. That I know.
Q: How about his Journeyman's license?
A: I don't believe he did that either. I don't think so.
Q: How about Mike, whose name you don't know?
A: No, I have no idea — Mike had worked for another alarm company prior a little bit, so Mike had some experience when he came to P&J Alarm.
Q: Did they have a Journeyman's license?
A: I don't know if Mike ever had any fire alarm license whatsoever.
Q: You mentioned something about employees who may have been paid under the table.
A: They were paid cash to work.

Page 58

MR. JOHNS: Move to strike.
Q: Were these experienced employees or just —
A: No.
Q: They were employees that just were there to help with overload of customers?
A: Yes, workload. Never have too many customers.
Q: Do you know names of any of those people who were paid under the table?
MR. JOHNS: Objection.
Q: I'm just using your words, "under the table." Not on the payroll of P&J.
A: Well, I have a — when I left my job there's recorded, the Department of Labor and Training, how I left, because she was questionable practice of paying people on 1099s who are unqualified.
MR. JOHNS: Objection. Move to strike.
Q: When you say they were unqualified, what do you mean by that?
A: Because in order to be paid on 1099s you have to have your own license, have liability insurance. You need to be self-sustaining as your own business and you would be like a subcontractor; the only type of people in our business who could be paid on 1099s. Everybody else has to be paid on the books.

Page 59

MR. JOHNS: Objection.
Q: Okay. You have specific information that — as you sit here you have specific information that there were employees such as you've described who were not on the payroll but were, in fact, being paid in cash under the table?
A: Yes.
MR. JOHNS: Objection.
Q: And it's your observation these people weren't qualified to install fire alarm systems?
MR. JOHNS: Objection.
A: Absolutely.
Q: How many fire alarm systems would you say you installed between 1991 and 1994? Residential, I will limit it to.
A: You mean adding smokes to the burglar alarm?
Q: Yeah, you can do that and then we'll expand from there.
A: It's a different type of alarm, too. I would say maybe one-tenth of our residential customer base had smoke detectors.
Q: What's your observation —
A: Her base. It's not my base. Strike that word, please.
Q: What's your observation about that statement? Was

Page 60

that sufficient?
A: For residential smoke customers? The percentage of monitored or alarm systems that are out there that have smokes tied into them?
Q: Yes.
A: I would say it's about 10 percent. That's pretty accurate.
Q: What percentage of your installations were residential versus commercial in the period 1991 through 1994?
A: The company was not just — oh, installation only?
Q: Yes.
A: There was probably 75 residential, 25 percent commercial. Maybe 70-30, somewhere in there.
Q: So significantly more residential than commercial installation.
A: Yes.
(Discussion off the record.)
Q: Did you also perform service in addition to installation?
THE DEPONENT: I would have worn a better T-shirt today.
A: Yes.
Q: And did you service the same manner, 70 percent residential, 30 percent commercial, or was it

Page 61

changed because of inspection requirements?
A: Say that again.
Q: Was the breakdown for service versus installation the same, 70-30 residential/commercial, or did the percentages change because of inspection requirements?
A: Yeah, you do a very specialized type of service with commercial fire alarm inspections. That's a service all in itself.
Q: And P&J did that work?
A: Yes, accordingly, fire alarm contracts, yes. Probably still trying to do it.
Q: You need to hold Master's licenses to do quarterly fire inspections?
A: You need to hold an A, an AF, or an AFC. Those are the only three licenses allowed.
Q: Okay. Is there any residential requirement for inspection on a quarter basis?
A: No.
Q: How about on annual basis?
A: By law?
Q: Yes.
A: No, residential less than four units. Four and above there is.
Q: Okay. But single family?

Page 66

A: Greatly, yeah.
Q: You indicated in 1994 you would not have been the person to go out and survey the property to recommend what they would have needed. Is that correct?
A: Yes.
Q: Fair statement. Your role would have been to install the system that had been recommended?
A: You got that sheet right in your hand, except the price would have been blackened out.
Q: Now, I believe you're pointing to a proposal. It's on P&J Alarm paper.
MR. CAPLAN: Why don't we mark this.
A: I can see it says update system, so I was correct, there was a system in that building.
Q: Let's wait for a question.
MR. CAPLAN: We'll mark this as Plaintiff's 5.
(P&J ALARM PROPOSAL DATED 6/15/94 TO MRS. AMY LARRAT WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 5 FOR IDENTIFICATION.)
Q: I'm going to show you what we've had marked as Plaintiff's Exhibit 5 and ask if you can identify it for me.
A: It's a general proposal from P&J Alarm.
Q: Is it for the Larrat residence?

Page 67

A: Yes.
Q: And what is it dated?
A: 6/15/94.
Q: At that point in time, June 15th, 1994, did you hold your Master's license?
A: No.
Q: Did you hold a Journeyman's license?
A: No.
Q: So you were still an apprentice?
A: Correct.
Q: Is Plaintiff's Exhibit 5, the proposal, is that a document that would have set your installation in motion, meaning that you would have obtained a copy of this and then gotten the parts and gone to the residence?
A: That's correct.
Q: All right. Did you have any input as an installer into choosing or selecting the items on the proposal?
A: No.
Q: Who did that?
A: Judy Santa.
Q: Do you know if Judy Santa was ever at the Larrat residence before she issued this proposal?
A: Oh, I'm sure she was, because otherwise how would

Page 68

she do this proposal.
Q: If she had not gone to the residence but issued a proposal anyway, would that create some type of issue with you as an installer?
MR. JOHNS: Objection.
A: No, it wouldn't, but somebody's already noted on the proposal they're updating an existing system, so somebody had to go to that residence to see it to realize there was one there.
Q: Now, if you were updating an original system —
A: An existing system.
Q: — an existing system, is that different than putting in a new system?
A: Yes.
Q: How does that differ?
A: There is either a functional or nonfunctional system in place, installed, either by us at a previous, earlier time, or by someone else.
Q: Can you tell by looking at this proposal whether or not the existing system was a local system, meaning that it would only sound an alarm within the house, or was it a monitored system?
A: I don't remember whether the system that was installed when we went to update was monitored or not. I have no idea.

Page 69

Q: The question was can you tell by looking at this?
A: No, you can't.
Q: You can't.
A: No.
Q: Is there any document that you could look to to find out —
A: No.
Q: — whether or not the system was a local or monitored system?
A: No, there is not. To the best of my knowledge the system that was in place that we removed was not installed by P&J Alarm.
Q: Do you know who it was installed by?
A: No, I do not. To the best of my knowledge, if I am not mistaken, it was an Ademco panel, which would not be P&J Alarm's equipment.
Q: The panel that was existing was removed by you?
A: Yes.
Q: And was replaced by a panel that you sold, that P&J sold to the Larrats?
A: Yes. Correct.
Q: Who made the choice of that equipment?
A: Judy Santa.
Q: How would you obtain the equipment necessary for the installation?

Page 86

Q: In 1994, when you did this installation, you were still an apprentice?
A: That's correct.
Q: As you said, there's nothing in any of the documents that you've reviewed, and you have not personally seen whether or not a permit was pulled for the installation?
A: There's nothing on any of the documents on this table that indicate a permit was pulled.
Q: And you don't know personally whether or not a permit was pulled for this installation?
A: That's correct.
Q: Would it have been required to have been pulled?
A: If these are the only smoke detectors in the house, yes.
Q: So if there were additional smoke detectors in the house, there would not have been a permit necessary?
A: Not by — the State wouldn't have required it.
Q: How about any local —
A: Authorities?
Q: — authorities?
A: It's Catch 22, because they won't look at them. They won't come out and look at your damn installation if the house has a CO on it.

Page 87

Q: Do you know whether or not there was a local requirement that if there had been existing smoke detectors in —
A: All the fire alarm installation work in the State of Rhode Island is required to pull a permit prior to doing the work.
MR. JOHNS: Objection.
A: And that would include this installation.
Q: So if a permit was not pulled for this installation, it would be a violation of Rhode Island code?
MR. JOHNS: Objection.
A: Yes.
Q: As the installer, you weren't required to view whether or not a permit had been pulled?
A: I don't understand the question. I was an apprentice at the time.
Q: Okay.
A: Why would I be required? I wasn't responsible for anything I did as an apprentice.
MR. JOHNS: Objection.
Q: Who would be responsible?
A: The Master.
MR. JOHNS: Objection.
Q: Who was the Master in 1994?

Page 88

A: Jim Governo.
Q: Do you know if Jim Governo had any role in the installation of the Larrats' system?
A: No, he did not.
Q: So once the panel was installed he did not look at it?
A: That's correct.
Q: All right. So you would have taken the old panel out, old Ademco panel out; correct?
A: Yes. Go ahead; I'm sorry.
Q: Is that right?
A: Yes.
Q: And would have attached the existing wires into that new panel?
A: That's correct, some of them.
Q: Some of them?
A: Right, what you could salvage.
Q: And if you couldn't, then you would run new wires?
A: Correct.
Q: And then if there was additional equipment you'd also wire that into the panel?
A: Yes. Yeah, obviously there was additional equipment, updating the smokes. So there was smoke detector wire, but whether the smoke detector — I bet you it was on JK and was left

Page 89

that way.
Q: What do you mean JK? What do you mean?
A: Jack cord. 22-Four, 22-Four conductor solid wire.
Q: And you said —
A: I'm not sure; I don't know whether it is or not, but if it —
MR. JOHNS: Objection.
A: Being as old an installation as it is, and we were updating, that was prior to any codes of FPL coming into effect, which is a type of wire, FPL, which was the required wire the smoke detectors be installed on. If they were updating, it would have probably been put back onto the noncode wire.
MR. JOHNS: Objection.
Q: Would it be a code requirement to put the new code compliant wiring into the system?
A: Yes.
Q: Was it P&J's practice not to update the wiring?
A: Sometimes you can't because if it was an existing installation and some of the wiring were done as a prewire as the house was being built, you could not get new wires without causing all kinds of damage so you would use what was there.
Q: But that would not be in compliance with the code?
A: Well, yeah, no, not if you were — if this was the

Page 110

(Discussion off the record.)
MR. CAPLAN: We've marked the inside door panel picture as Exhibit 10.
(COPY OF PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 10 FOR IDENTIFICATION.)
(COPY OF PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 11 FOR IDENTIFICATION.)
Q: I've marked as Exhibit 11 a closeup photograph of the printed circuit board that's I believe within the Napco panel. Does that look familiar to you?
A: Yes.
Q: Looks familiar as a printed circuit board that you would find in a Napco panel; —
A: Yes.
Q: — correct?
A: Yes.
Q: In the center of this photograph is an area for a fuse.
A: Uh'huh (affirmative).
Q: Do you see that?
A: Yup.
Q: But it doesn't appear that a correctly-sized fuse is placed into that.
A: That seems unlikely true to me, though. It appears to be the right size. It doesn't appear

Page 111

to be the right length.
Q: Okay.
A: They come in two different lengths, but it's a very fine wire in there. It's just that this — fuses are made in two different size. Napco uses a very short nap and it might not have been available, but see, it's extending that out. But it's still the fuse through the fuse. That's still properly fused.
Q: Okay.
A: It's going to utilize the wire inside the fuse to complete the circuit. It's not shorting across these two terminals. If you look very carefully, you'll see what I'm saying. It comes through the copper conductor wrapped around the head which connects to the inner wiring inside the glass tube, which goes to this other cap on the other end. So it's feeding through this wire, through the foil, through the fuse and then makes, bridges to the other side where it needs to supply the power on. It's still fused correctly. I can't see the amperage of the fuse, no.
Q: Let me ask you if you have any specific recollection of creating this particular fused system, I'll call it.

Page 112

A: It may have been done to get by on a particular day, yeah.
Q: I asked you earlier in the deposition whether or not —
A: You asked me for incorrect fuse sizes.
Q: I asked you earlier in the deposition whether or not you would install, as a P&J employee, an improperly-sized fuse.
A: That's correct.
Q: And it's your contention that even though this fuse does not fit, it is still properly sized?
A: Yes.
Q: And is it your contention that you were the person who in fact —
A: Oh, yeah, I may have done them like that, absolutely, to keep somebody up and running, yeah. Because if it's this right size fuse, the amperage rating we're talking about, not length of tube.
Q: How did you go about rigging this so that it would be, so it would fit with inside the smaller encasements?
A: What do you mean?
Q: Well, I mean did you take a wire, paper clip?
A: This particular, this looks like — this is probably 22 conductor wire, which is of the

Page 113

stranded four wires I said. It's one of the conductors, wrapped around the head, and this looks like window foil to me.
Q: Window foil?
A: Uh'huh (affirmative).
Q: Yes?
A: Yes.
Q: And you'll agree with me that one end of the fuse is placed into — what would you call this?
A: The fuse socket.
Q: The fuse socket. And one end is not placed into the fuse socket?
A: That's correct.
Q: Okay. Instead one end is actually elevated and resting on top of the other fuse socket.
A: Correct.
Q: All right. And there is a copper conductor that is run to the other fuse socket and tied to the length of the fuse by a material that you've designated as window —
A: Window foil.
Q: Window foil?
A: Right.
Q: Is that an accurate statement?
A: Yes.

Q: It's your contention that this is an acceptable means of placing a fuse into an alarm panel?
A: No.
Q: It's not acceptable?
A: No, it is not.
Q: Would this be a violation of code?
A: No, because it's still the correct size fuse. It's still tripping at the correct amperage. The fuse's purpose is, it's still making the correct amperage across the two terminals.
Q: Did you test the fuse for continuity?
A: No. I'm sure the circuit had to work to get out of there. I'm sure whatever was done here brought back to life whatever circuit this is tied to.
Q: How do you know?
A: You wouldn't leave the customer's house because they wouldn't have any aux, auxiliary power or bell circuit power, would be one of the two. I can't remember what's on the 1008E for fuse circuits, but if a fuse were missing the panel would be in trouble.
Q: And as you sit here today and look at this you can tell that that fuse is in a proper working condition?



A: No, you can't, not without a meter.
Q: If the fuse was not in a proper working condition, what could be a result?
A: You would have trouble on the panel. All circuits on these panels are supervised.
Q: Would there be the potential that the panel would not be able to send a signal?
A: No. Digital communicators on these particular panels are nonfuse circuits.
Q: You said you can't tell me what the amperage rating is?
A: No, I can't see it. All I can see is bus — fuse, it says fuse. But it is a very small fuse because it's a very, see, bus right there, but it's a very small, it has to be five amp or under. See how fine the wire is in there?
Q: And five amp or under is —
A: I don't know what that —
Q: Let me finish the question.
A: Okay.
Q: Five amp or under would be the correct size fuse for this particular system?
A: I don't know what 1008s use. It's either five, two, or three amps.
Q: Did you use this type of setup in other panels?



A: In an emergency, yes, if I have to get something running.
Q: What would have prevented you from obtaining the proper fuse?
A: Nothing would have. You could come — they just failed to go back to the customers at the end.
Q: Who's they?
MR. JOHNS: Objection.
A: P&J Alarm.
Q: Would what have prevented you, as a P&J employee from notifying Judy Santa that you didn't have the proper size fuse?
A: I probably did.
Q: You probably did?
A: I'm sure I did, yes.
MR. JOHNS: Objection.
Q: And what would have prevented Judy Santa from actually going back inside and replacing —
A: Might have been time limitations to the day. Could have been the end of the day.
Q: What would have prevented P&J from going back the next day or the next week or the next year to replace this?
A: There's no excuse.
MR. JOHNS: Objection.



Q: Did you make service calls to the Larrats' residence?
A: Yes, I believe.
Q: When you made a service call did you look inside the panel?
A: I'm sure I did. That's the first thing you go to.
Q: So if you had been back to the house several times after the initial installation, you would have seen the fuse in this condition?
A: Well, the thing is, this could have been done on one of those service calls, not during the initial installation, because the reason you went there is — if I'm not mistaken — is because that house was struck by lightning before and I thought, personally, we changed a telephone line surge suppressor on that property.
Q: If I represent to you I've obtained the service records from Judy Santa for this household and there's no evidence of either a prior lightning strike or damage to the phone line that needed to be repaired, would that change your testimony?
A: No, wouldn't change my testimony because that's my impression. That's what I remembered when I drove by the house. That's what flooded back to

Page 130

A: Yup.
Q: Okay. Doesn't change your opinion at all looking at that closer?
A: Right. I still can't tell whether it's making contact or not.
Q: It does not change your opinion as to the fact it's not a proper installation?
A: No, it's not a proper installation.
(COPY OF COLOR PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 15 FOR IDENTIFICATION.)
Q: I'm going to show you 15 and ask you if you know what these wires — wait a minute, let me finish the question — what the wires in the picture represent. For the record they appear to be insulated with blue and white insulation and they are striped in various different places. Do you know what those two wires represent?
A: The white and blue and blue and white? Those would generally be telephone company telephone lines. Those are markings that the phone company uses for paring of multiple pair wires.
Q: Do you know why they would not have been connected inside the panel?
A: They probably weren't used.
Q: Would you be charged with the responsibility of

Page 131

connecting the phone lines as part of your installation?
A: Yes.
Q: Is there any requirement that the phone company sign off on that?
A: That I'm not aware of. What do you mean? To tie in a burglar alarm system onto a phone line?
Q: Or fire alarm.
A: This is a combination burglar/fire alarm. This is not a fire alarm system, believe me. It's a burglar alarm.
Q: That has fire detection capabilities?
A: Yeah. And heat, those are smokes with heat.
(COPY OF COLOR PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 16 FOR IDENTIFICATION.)
Q: Earlier in your testimony you had answered, in response to one of my questions, you weren't sure whether or not they had any additional heat detectors other than what was listed as replacement in the kitchen. I'm going to show you what I'm marking as Exhibit 16. It appears to be a picture of a smoke detector. Is that also a heat detector?
A: To the best of my knowledge that's smoke with hat. The two external chambers are the heat detecting

Page 132

devices on the two sides.
Q: Thank you. I show you the backside of that where it indicates that it's a smoke with heat detection. Does that help you confirm your suspicions?
A: Yeah. I wasn't suspicious, no. This particular smoke does not have heat.
MR. CAPLAN: The witness is referring to a different type of smoke detector which I'm not going to mark which does not appear to have those additional areas that contain the heat detection components.
(COPY OF TWO COLOR PHOTOGRAPHS WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NOS. 17 AND 18, RESPECTIVELY, FOR IDENTIFICATION.)
Q: I show you 17 and ask you to take a look at that along with 18.
MR. CAPLAN: The witness is chuckling, and I'm going to ask him about that.
Q: What do 17 and 18 depict?
A: 17 and 18, well, 17 is the back —
MR. JOHNS: Can we go off for one second.
(Discussion off the record.)
(Mr. Johns exits/enters conference room.)
Q: I think the question is what do Exhibits 17 and 18 depict?

Page 133

A: The backside of a smoke detector with a cigarette lodged between the base and the smoke detector head.
Q: And I asked you earlier in the deposition whether or not you smoked and you said that you did and that you had used cigarettes to test smoke detectors. Would you make it a practice of placing a cigarette butt in the back of a smoke detector when you were done?
A: No, no, and I didn't smoke Merits, so.
Q: So you have no idea how a used Merit cigarette would have ended up behind the smoke detector?
A: No. But, very strange, that is my handwriting.
Q: Indicating the handwriting inside the smoke detector on the Exhibit 17. What does the handwriting say?
A: "Entryway."
Q: And it's written in black magic marker?
A: Yes.
Q: Why would that have been written?
A: It's not programmable smokes, so I don't know why they would have written — only when you use addressable smoke detectors, it's a style, type of smoke detector that's data input, as opposed to voltage sensitive changes. They would be

Page 134

programmed prior to us putting them into the particular locations in a programmer, and this is certainly not the case with these smokes.
Q: And you're certain that that's your handwriting?
A: Yeah, I'm pretty sure I print like that, yup.
Q: Okay. I'm going to show you that marking, another picture of a smoke detector — I'm sorry — the kitchen heat detector with handwriting on it.
A: That's not my handwriting. You can see a difference in the handwriting.
Q: So you did not write the word "kitchen"?
A: No.
Q: And that would be on the outside of the heat detector?
A: No, that does not look like my style of writing. The T like that, no.
Q: Referring back to the other two exhibits, Exhibits 17 and 18, you still believe that's your handwriting?
A: It doesn't really, that does not look like — this looks like my handwriting. That does not as much look like my handwriting and I can't for the life of me why I'd write Kitchen on a customer's outside, which was visible. There's them.

Page 135

MR. CAPLAN: We'll mark this as 19.
(COPY OF COLOR PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 19 FOR IDENTIFICATION.)
Q: Plaintiffs 19 is, once again, another closeup — I think it's closer than the last one — of a ground wire with a little bit more detail.
A: Right, very poorly terminated.
Q: Okay.
A: But very doubtful that it's touching the diodes because the panel would not operate if it did.
Q: Possible that may have touched the diodes and not have been operating on the night of the fire?
A: Could have done that.
Q: Okay.
(COPY OF COLOR PHOTOGRAPH WAS RECEIVED IN EVIDENCE AS PLAINTIFF'S EXHIBIT NO. 20 FOR IDENTIFICATION.)
Q: I show you what I'm marking as Plaintiff's 20, and it's a panel overview, —
A: Uh'huh (affirmative).
Q: — the whole panel.
A: Yup.
Q: The wires that are coming in at the bottom, are they —
A: Remember — go ahead.
Q: Let me finish the question. Are they assembled

Page 136

or installed in any particular consistent manner?
A: Yes.
MR. JOHNS: Objection.
A: I can see where the battery was in that box.
Q: Okay. What does that mean?
A: Where this big opening area where there's no wiring? Probably held a seven amp or 12 volt battery.
MR. CAPLAN: The witness indicated the lower left-hand side of the panel.
A: All the circuit board wiring is pushed to the side because that's what the long panels are like. That particular one is extremely sloppy. Of course, I was an apprentice then.
Q: Did you get less sloppy and more —
A: Neater?
Q: Yeah, more neat as you obtained your Journeyman's license and then your Master's license?
A: Yes, but neatness does not affect the performance of the panel, really, in truth.
Q: But you would characterize this as being a rather messy set of wires?
A: It was an update of an existing installation, so you're working with twisted pair and wires that don't behave the way you want them to. We use

Page 137

all jack cord. It's easy to get them in a shape you want them to be in. This particular panel is lucky that it received a ground because the industry usually doesn't ground the panels. That is common practice in the burglar alarm industry.
Q: But this is a burglar alarm with fire capability?
A: They all had a grounding leg, but it's what people believe in the industry.
Q: Okay. How long did this installation take?
A: Maybe a day, I'm sure. Maybe longer. We had to do smokes. Can I look at the —
MR. JOHNS: Are you just referring to 1994?
MR. CAPLAN: The '94 installation.
MR. JOHNS: As opposed to '98.
MR. CAPLAN: Haven't got to the '98.
A: Already had two keypads, so a change out. Change the smokes, so I don't — when it says update smoke detector, I don't know whether they ran additional wire for additional smoke detector, because it doesn't even tell me how many smokes are in the system, so.
Q: Would you have, as part of your wire ledger or any other document made at the scene, would you have documented exactly what equipment was in the house

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **VERMONT MUTUAL INSURANCE COMPANY** a/s/o Paul and Amey Larrat<br>Plaintiff<br><br>v.<br><br>**P & J ALARM COMPANY**<br>Defendant | C. A. No.: 04-315T |

**AFFIDAVIT OF PAUL LARRAT**

Paul Larrat hereby deposes and states as follows:

1. I am of adult age and I am under no disability which would affect the truth of the statements contained herein.

2. I have personal knowledge of the facts contained herein.

3. On July 5, 1994 I entered into a purchase agreement and an Alarm Monitoring Service Agreement with P&J Alarm Company, Inc. (hereinafter "P&J).

4. On March 13, 1998, I entered into another purchase agreement with P&J.

5. At the time I entered into all three of these agreements, I believed that P&J was certified and properly licensed to perform fire alarm installation and monitoring work.

6. I was never told by P&J that they were not properly licensed or certified.

7. If I had known that P&J was not certified or properly licensed, I would not have entered into any of those agreements.

8. I did not find out that P&J lacked the State required licensure until I was notified by counsel for my insurance company during this litigation.

Dated this 1 day of ~~May~~ JUNE, 2005.

Paul Larrat

SUBSCRIBED AND SWORN TO BEFORE ME THIS 16 DAY OF ~~May~~ June, 2005

NOTARY PUBLIC FOR THE STATE OF RHODE ISLAND
My commission expires: 4 MAR 06